IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

**BANK OF ALBUQUERQUE, N.A.,**

    Plaintiff,

v.                                                                         Civ. No. 07-44 BB/WDS

**WILLIAM T. DYKES, SHARON T. DYKES,
ANTONIO P. MALDONADO, AND JUANITA H.
MALDONADO,**

    Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court for consideration of a motion for summary judgment filed by Plaintiff (Doc. 38). Having reviewed the submissions of the parties and the relevant law, the Court finds that the motion for summary judgment should be granted in part and denied in part.

**Summary of Relevant Facts**

Defendants were investors in a company called Sandia Food Group ("SFG"), which was in the business of building and operating a group franchise, restaurants called Johnny Carino's. An individual named Mark Day was in charge of SFG, and a woman named Julia Milloy worked for SFG as a financial officer. In 2004, SFG maintained an account with Plaintiff Bank of Albuquerque. At some point during that year or thereabout, SFG began experiencing cash-flow difficulties and requested a working-capital loan from Plaintiff. After reviewing SFG's financial information, Plaintiff refused this request because SFG was not financially strong enough to meet Plaintiff's underwriting requirements. Following this refusal, Day and Milloy approached Defendants to ask whether they would be willing to obtain a $200,000 line of credit from Plaintiff. Defendants understood they would be guarantors of the line of credit, rather than principal borrowers. Day and Milloy also told Defendants that only small amounts would be withdrawn from the line of credit each month, to meet SFG's temporary needs for cash, and that

these amounts would be replenished so that the available line of credit would always remain approximately $200,000.  As Defendant William Dykes described in his deposition, the line of credit was presented to him as a "risk free proposition."  Defendants agreed to enter into the transaction in early March 2005.

Contrary to Defendants' understanding of the nature of the transaction, the paperwork for the line of credit did not obligate SFG in any way, and did not even mention SFG.  Defendants were listed as borrowers, not guarantors, and the only signatures appearing on the paperwork, other than that of Plaintiff's representative, belong to Defendants.  All of the paperwork for the line of credit was funneled to Defendants through Ms. Milloy; Plaintiff did not submit it directly to Defendants.  In fact, Defendants did not meet with any representative of Plaintiff prior to signing the line-of-credit documents.  Due to the trust Defendants placed in both Mr. Day and Ms. Milloy, Defendants signed the necessary documents without understanding just what their obligations would be under the line-of-credit arrangement.  Their trust, unfortunately, proved to be misplaced.

Despite the fact that Defendants had been assured the line of credit would not be depleted, but would be replenished on a periodic basis, the entire $200,000 line was exhausted within a relatively short period of time.  Initially, $30,000 of the line was used to pay the interest on a construction loan Plaintiff had made to SFG at an earlier date.  The remainder of the line was apparently quickly used up for operating expenses.  Defendants did not find out this had occurred, however, until the spring of 2006, when the one-year term of the line of credit expired.  SFG, even though it had no obligation on paper for the line of credit, had made the required monthly interest payments on the line of credit, but had paid nothing toward the principal.  Therefore, at the end of the year Defendants owed Plaintiff $200,000 on the line of credit.  A representative of Plaintiff, Gary Martinez, called Defendants to inform them of that fact, and

Defendants understandably were shocked and upset. With the help of Mr. Martinez, Defendants were able to convince Mr. Day to pay down $20,000 of the principal owed. Defendants then signed a new promissory note, agreeing to pay Plaintiff $180,000 plus interest, to eliminate the remainder of the line-of-credit debt. Based on assurances from Mr. Day and Ms. Milloy, Defendants assumed, or at least hoped, SFG would actually pay the $180,000. Due to SFG's financial troubles, this did not occur. Sadly, Mr. Day committed suicide and no further payments were forthcoming from SFG.

Defendants felt that they had been taken advantage of, and that Plaintiff had played a part in the problem. Therefore, they refused to make any payments on the $180,000 promissory note. As a result, Plaintiff filed this lawsuit seeking payment of the entire balance owed, plus interest and attorney's fees. As justification for their refusal to pay, Defendants claimed Plaintiff had concealed significant information from them. This failure to disclose information, according to Defendants, violated what they term the "doctrine of deceit" that has been adopted in New Mexico case law. Plaintiff has moved for summary judgment, contending Defendants are liable on the $180,000 promissory note as a matter of undisputed fact.

**Standard of Review**

Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Medina v. Income Support Div.*, 413 F.3d 1131, 1133 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). In response, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith*, 475 U.S. 574, 587-88 (1986). To avoid summary judgment, the nonmoving party may not rest upon the mere allegations in the pleadings but must show, at a minimum, an inference of the existence of

each essential element of the case. *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Hulsey v. K-Mart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). When viewing the evidence, the Court must draw reasonable inferences in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.

   **Discussion**

   **Preservation of Defense:** As noted above, the only argument raised by Defendants in opposition to the motion for summary judgment is their contention that Plaintiff deceived them by failing to disclose relevant information.[1]  Initially, Plaintiff contends Defendants have waived this argument by failing to plead it with particularity in their answer to the complaint. Plaintiff maintains that a cause of action for failing to disclose information is in effect the same as a cause of action for misrepresentation or fraud, and that such claims must be plead with specific facts to survive a motion to dismiss. Assuming Plaintiff's argument is correct, the Court nevertheless declines to rule against Defendants on the basis of this alleged procedural shortcoming. Plaintiff did not move to strike Defendants' answer on the pleadings, or ask for a more particular statement of allegations. At this point the parties have concluded discovery, and as discussed below the materials attached to the summary-judgment pleadings make clear just what information Defendants contend should have been disclosed. Under these circumstances, the Court has discretion to treat Defendants' summary-judgment submissions and arguments as a motion to amend their answer to plead their defense with particularity. *See, e.g., Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir.2003) (inclusion of new allegations in a response to a motion for summary judgment should be considered a request to amend the complaint); *Viernow*

---

[1] There are suggestions in the deposition testimony of some Defendants that they did not remember signing certain line-of-credit documents, and that their signatures might have been forged on those documents. That potential defense has not been pursued in response to the motion for summary judgment, and the Court therefore does not address it.

*v. Euripides Dev. Corp.*, 157 F.3d 785, 797 n. 26 (10th Cir. 1998) (such new allegations may be treated as motion to amend under Rule 15). The Court will do so and address the merits of Defendants' "doctrine of deceit" argument. *See* 26 Williston on Contracts § 69.30 (4th ed.) (under the doctrine of deceit "simplified pleading becomes nearly, if not quite, impossible.")

**Duty to Disclose Information:** It is well-established, in New Mexico and elsewhere, that under certain circumstances one party to a transaction has a duty to disclose information to the other party or parties, and may be held liable for failure to satisfy that duty. *See, e.g., McElhannon v. Ford*, 73 P.3d 827, 831 (N.M. App. 2003); *Everett v. Gilliland*, 141 P.2d 326, 330-32 (N.M. 1943). This general rule has been specifically applied to situations such as the one in this case, involving a bank (Plaintiff), the bank's customer (SFG), and third parties (Defendants). *See R.A. Peck, Inc. v. Liberty Fed. Sav. Bank*, 766 P.2d 928, 933-34 (N.M. App. 1988); *see also, e.g., Stockmen's Livestock Market, Inc. v. Norwest Bank of Sioux City*, 135 F.3d 1236, 1243-44 (8th Cir. 1998); *Richfield Bank & Trust Co. v. Sjogren*, 244 N.W.2d 648, 650-51 (Minn. 1976).

From these and other cases the following rules can be derived. First, no liability for failure to disclose arises unless a duty to disclose the information existed. *See Peck*, 766 P.2d at 933. Second, a bank's duty to disclose information about a depositor is in conflict with the bank's duty of confidentiality toward its depositors, and this affects the circumstances in which a duty to disclose arises. *See id.*; *see also Barnett Bank of West Florida v. Hooper*, 498 So.2d 923, 925 (Fla. 1986); *Sjogren*, *supra*, 244 N.W.2d at 651. Third, in spite of the duty of confidentiality a bank owes its depositors, there are instances in which a bank nevertheless owes a duty of disclosure to third parties dealing with both the bank and the depositor. Examples of such instances include the following: (1) where the bank was in a fiduciary relationship with the third parties prior to the transaction in question; (2) where the third parties expressly reposed a trust

5

and confidence in the bank; (3) where the bank conveyed some information to the third parties, and the failure to disclose further information would make the information that was provided misleading; (4) where the bank has special knowledge material to the transaction, and knows the third parties do not have access to that knowledge; and (5) where the bank knows its depositor is committing or planning to commit fraud.  *Peck, supra,* 766 P.2d at 933-34; *Barnett Bank, supra*, 498 So.2d at 925; *Tokarz v. Frontier Fed. Sav. and Loan Ass'n*, 656 P.2d 1089, 1092-93 (Wash. App. 1982); *Sjogren*, *supra*.  This list is not exhaustive, as other special circumstances might also give rise to a duty of disclosure.

In this case, Defendants maintain Plaintiff did not disclose several crucial facts:  first, that SFG was in a precarious financial position, so much so that Plaintiff refused to lend any more money directly to SFG; second, that $30,000 of the line of credit would immediately be paid to Plaintiff to pay off interest owed on the prior construction loan; and third, that SFG would be able to draw down the entire line of credit without replenishing it, and would be likely to do so, even though Mr. Day and Ms. Milloy told Defendants that would not happen.  Defendants also complain that Plaintiff did not notify them immediately when SFG failed to make any payments on the line of credit, except the monthly interest payments, which meant Defendants were left unaware that SFG was not complying with its oral assurances to Defendants as to how the line of credit would be used.  The Court will address these disclosure issues separately with regard to the Maldonado Defendants and the Dykes Defendants, as there is different evidence in the summary-judgment record concerning the communications each Defendant had with Plaintiff before the line-of-credit transaction was consummated.

**Maldonado Defendants:**  Both Antonio Maldonado and Juanita Maldonado ("Maldonados") testified at their depositions that they had no contact with Plaintiff prior to signing the line-of-credit documents.  They did not ask Plaintiff for any information about the

6

terms of the line of credit or SFG's financial circumstances, or about anything having to do with the line of credit, because they trusted Mr. Day. [Pltf. Exh. B, pp. 23, 28-29; Pltf. Exh. C, pp. 20, 24, 57; Def. Exh. 2, pp. 29, 33-34; Def. Exh. 4, p. 30]  They did not even go to one of Plaintiff's branch banks to sign the line-of-credit documents, but signed them at SFG's office. [Def. Exh. 2, p. 34]  All paperwork regarding the line of credit, including the information concerning the Maldonados' finances that Plaintiff had requested prior to approving the line of credit, was funneled through Ms. Milloy rather than being submitted directly to Plaintiff. [Def. Exh. B, pp. 18-19; Def. Exh. C, pp. 17-18; Pltf. Exh. 1, pp. 15, 17, 23-24]  Furthermore, there was no prior relationship of any kind between Plaintiffs and the Maldonados at the time the line-of-credit transaction was completed. [Def. Exh. B, p. 18]

The deposition testimony outlined above makes it readily apparent that none of the "special circumstances" imposing a duty of disclosure on Plaintiff were present in this case, with respect to the Maldonados.  Plaintiff had no fiduciary relationship with the Maldonados.  In addition, they could not have expressly reposed any sort of trust or confidence in Plaintiff, since they had no direct contact at all with Plaintiff prior to signing the line-of-credit documents.  Similarly, given the lack of contact between Plaintiff and the Maldonados, it cannot be said that Plaintiff conveyed any information to the them that might have become misleading if further information was not provided.  As to the fourth possible special circumstance, it is true that Plaintiff had knowledge that would have been material to the transaction, concerning SFG's poor financial condition at the time of the line-of-credit transaction.  However, there is no evidence that Plaintiff was aware the Maldonados did not also have access to the same information.  Plaintiff's representative, Mr. Martinez, had been told the Maldonados were investors in SFG, and he assumed that as shareholders and investors, they would be aware of SFG's deteriorating financial situation. [Def. Exh. D; Pltf. Exh. 1, pp. 14-15, 18-19]  Absent some evidence that

Plaintiff was aware the Maldonados were acting without any knowledge at all of SFG's money issues, there is no basis for a finding of special circumstances simply on the basis that Plaintiff did know about SFG's financial problems.

The final special circumstance that has been discussed in other cases arises where the bank knows its depositor is committing or planning to commit fraud. If there was any evidence in this case that Plaintiff knew Mr. Day and Ms. Milloy were lying to the Maldonados about the line of credit and the way it would be used, summary judgment would not be appropriate. However, there is nothing in the summary-judgment record pointing to the existence of such evidence. Plaintiff's representative, Mr. Martinez, specifically testified he did not know what representations Ms. Milloy or Mr. Day made to the Maldonados prior to the line-of-credit transaction. [Def. Exh. 1, pp. 22-23] There is no evidence contradicting this statement. There is also no evidence that Mr. Martinez, or any other representative of Plaintiff, knew SFG planned to quickly exhaust the line of credit rather than using it in the "normal" way, withdrawing and replenishing funds on a periodic basis.[2] Since Mr. Martinez did not know what the Maldonados were being told about the line of credit, he could not have known SFG was misleading them about how the line would be used, and thereby committing fraud. It should be noted that Plaintiff's mere knowledge that SFG was in financial difficulty does not give rise to an automatic inference that Plaintiff had knowledge SFG planned to commit fraud. *See, e.g., Sjogren, supra*, 244 N.W.2d at 651 (knowledge of insolvency is not necessarily equivalent to knowledge of fraud).

The Court therefore finds there is no evidence to support a determination that any of the special circumstances discussed in the case law apply to the relationship between the

---

[2]There is evidence that Mr. Martinez knew the first $30,000 of the line of credit would be used to pay the interest SFG owed on its prior construction loan from Plaintiff. That is the only evidence, however, concerning what Plaintiff knew about SFG's plans for the line of credit.

8

Maldonados and Plaintiff. The Court also finds that no other special circumstance existed in this case. The Maldonados point to several unusual aspects of the line-of-credit transaction which, according to the them, indicate Plaintiff was participating in SFG's scheme to obtain $200,000 from the Maldonados and the Dykes. First, Plaintiff never saw any Defendant face-to-face before agreeing to grant the $200,000 line of credit. Second, Plaintiff profited from the line-of-credit transaction because it was paid the $30,000 interest SFG owed on the prior loan. Third, Ms. Milloy wrote a letter to Plaintiff indicating she would be the only contact person regarding any information Plaintiff might want from the Maldonados or the Dykes, concerning the line of credit. [Exh. 2 to Def. Exh. 2] Fourth, Plaintiff insisted that Defendants sign a form authorizing Bryan Templeton, an employee of SFG, to act on Defendants' behalf with respect to the "day to day draws and repayments on the line of credit." [Exh. 9 to Def. Exh. 2; Def. Exh. 1, p. 26]

The Maldonados argue these unusual circumstances, taken together, give rise to an inference that Plaintiff was attempting to withhold information from them prior to the line-of-credit transaction. The problem with this argument is that it is not supported by any evidence, and therefore constitutes mere supposition. Plaintiff may well have been taking a risk by lending a large amount of money, sight unseen, on the sole basis of the documents SFG submitted to Plaintiff concerning Defendants' financial situations. The mere fact that Plaintiff was willing to take that risk, however, does not give rise to an inference of wrongdoing.[3] Similarly, Plaintiff

---

[3]In their summary-judgment brief, Defendants make a number of references to their theory that Plaintiff and SFG acted together to convince Defendants to enter into the line-of-credit transaction and then to keep them in the dark. There is no evidence in the record to support this characterization, at least with respect to the Maldonados. Mr. Martinez testified that Mr. Day and Ms. Milloy came up with the proposal to have Defendants apply for a line of credit on behalf of SFG, and there is no evidence (such as testimony from Ms. Milloy) to contradict his assertion that he played no role in selecting Defendants as potential borrowers. [Pltf. Exh. 1, pp. 14-15] The lack of evidence that Plaintiff participated in deceiving the Maldonados has already been discussed -- if Plaintiff had no contact with them, Plaintiff could not have played a role in the deception.

obviously could be expected to be eager to be paid the $30,000 interest that SFG already owed; absent some evidence that Plaintiff helped suppress the fact that the $30,000 would be paid out of the line of credit, however, there is again no possible inference that Plaintiff acted wrongly in insisting that the $30,000 be paid as a condition to the grant of the line of credit.  As to the letter from Ms. Milloy, there is no evidence Plaintiff initiated the letter or solicited it in any way, and no wrongdoing can be attributed to Plaintiff from the fact that Ms. Milloy wanted to be the sole conduit of information from Defendants to Plaintiff.  It is of course possible to infer that Ms. Milloy did not want Plaintiff contacting Defendants directly, because she did not want to jeopardize the line of credit; however, the only evidence in this case is to the effect that Ms. Milloy's actions were on behalf of SFG rather than Plaintiff.  Finally, Plaintiff's desire to have an SFG employee be authorized to make draws from, and reimbursements to, the line of credit is not a suspicious circumstance.  Plaintiff would naturally want to be protected from possible claims that it had allowed unauthorized withdrawals from the line of credit.  There is no evidence of a nefarious purpose behind Plaintiff's request for a signed authorization, especially where Defendants remained free to refuse to sign the authorization if they had any concerns about it.

 In sum, this is an unfortunate situation in which the Maldonados were misled by Mr. Day and Ms. Milloy.  Due to their trust in those two individuals, the Maldonados entered into an arm's-length transaction with Plaintiff that did not involve any misrepresentation, or direct communication of any type, between Plaintiff and the Maldonados.  The Maldonados signed the line-of-credit documents without even reading them or educating themselves about the potential risks of such a transaction, and were not even aware of their status as borrowers rather than mere guarantors.  There is no evidence, however, that Plaintiff had any role in concealing the details of the transaction or in preventing the Maldonados from learning of SFG's alleged plan to use the line of credit in a manner contrary to what Mr. Day and Ms. Milloy had been telling the

Maldonados. Plaintiff was entitled to assume that the Maldonados, as investors and shareholders who were being asked to incur a $200,000 obligation on behalf of SFG, would fully inform themselves before undertaking that obligation. Therefore, no special circumstances are present here and Plaintiff had no duty to disclose SFG's financial problems to the Maldonados prior to the line-of-credit transaction. Summary judgment is appropriate on the "doctrine of deceit" defense raised by the Maldonados in this case.[4]

Defendants make two other arguments that must be mentioned briefly. First, they contend there is an issue of fact as to whether Ms. Milloy acted as an agent of Plaintiff, making Plaintiff liable for her actions and misrepresentations. However, the only evidence is that Ms. Milloy was an employee of SFG, and approached Plaintiff about the line of credit rather than vice versa. Furthermore, there is no evidence Plaintiff communicated any information to Defendants concerning Ms. Milloy's power or authority to act on behalf of Plaintiff, other than to act as a conduit for loan documents. Therefore, there is no evidence raising an issue of fact as to her agency status vis a vis Plaintiff, particularly with regard to the misrepresentations she made to Defendants. *Romero v. Mervyn's*, 784 P.2d 992, 996 (N.M. 1989) (discussing sources of actual authority and apparent authority of an agent).

Defendants also contend they were wrongly induced to enter into the 2006 transaction, which essentially refinanced the $200,000 line of credit less the $20,000 principal reduction

---

[4] As noted above, Defendants also complain that after the line of credit was established, Plaintiff did not inform them that SFG was rapidly drawing down the balance and was not replenishing the principal. Since this failure to inform Defendants did not occur until after the indebtedness had been incurred, it cannot have induced Defendants to enter into the transaction in the first place. Furthermore, SFG was paying the interest and the principal amount did not come due for one year, and it does not appear there was anything in the contract requiring Plaintiff to inform Defendants of the status of the line of credit during that year. Similarly, the Court is aware of no common-law duty that requires a lender to keep a borrower abreast of the status of the borrower's loan. Instead, it would appear to have been incumbent on Defendants to keep up-to-date on the status of their $200,000 obligation.

11

made by Mr. Day.  Defendants argue they were told by Mr. Martinez that he would force SFG to pay the remaining $180,000.  It must be first noted that Mr. Martinez had no legal authority to force SFG to do anything, because SFG was not a party to the line of credit or the 2006 transaction.  Even if the promise to do something one has no legal authority to do could be considered wrongful inducement sufficient to void a promissory note, however, the evidence does not support the strong assertion made by Defendants in their brief.  Mr. Maldonado testified that Mr. Martinez said he would **help** get the money from SFG by putting pressure on them, and **try** to get them to make quarterly payments on the principal.  [Pltf. Exh. 4, pp. 63-64]  This was confirmed by Mr. Martinez, who stated in his affidavit and his deposition that he wanted to help Defendants by obtaining payments from SFG.  [Def. Exh. D; Pltf. Exh. 1, p. 31]  Defendants have cited no authority for the proposition that a promise to try to achieve a certain result can void a legal obligation if the attempt fails.  Furthermore, if Defendants had not signed the 2006 promissory note, they would have remained liable for the $200,000 line of credit that was canceled by the 2006 note.  Defendants will not be allowed to obtain the primary object of the 2006 note, which was cancellation of the $200,000 obligation, and then void the resulting obligation by arguing that an auxiliary promise, separate from the main consideration, was not fulfilled.  *See, e.g.,* 23 Williston on Contracts  § 63:3 (4th ed. 2002) ("A party is not automatically excused from the future performance of contract obligations every time the other party commits a breach; if a breach is relatively minor and not of the essence, the plaintiff is still bound by the contract and may not abandon performance and obtain damages for a total breach by the defendant ...").

**Dykes Defendants:** The situation with respect to the Dykes Defendants, or at least with respect to Mr. Dykes,[5] is different because there is conflicting evidence concerning Mr. Dykes' contacts with Plaintiff prior to the line-of-credit transaction. Mr. Martinez categorically denied having any contact with any Defendant prior to that transaction. [Def. Exh. D; Pltf. Exh. 1, p. 17] As noted above, the Maldonados confirmed they had no contact with Mr. Martinez or any other representative of Plaintiff during that time period. Mr. Dykes, however, gave conflicting testimony at various points in his deposition. At one point, he testified that Gary Martinez told him how the line of credit would work, "same as Julia." [Pltf. Exh. 6, p. 108] He also testified that Gary and Ms. Milloy both told him the line of credit would be used for vendors. [*Id.* p. 114] Earlier in the deposition, Mr. Dykes testified that "maybe" Mr. Martinez explained a line of credit to him, and added that "somebody" did, "one of the two" (referring to Ms. Milloy or Mr. Martinez). [Pltf. Exh. 7, mis-marked as Exh. 3, p. 44] He then said he was sure he did talk to Mr. Martinez before the line of credit was completed, but that he did not know where, when, or why. [*Id.* p. 45] A few pages later, he testified that Ms. Milloy told him the $200,000 would still be there at the end of the year, and that they would take out small sums here or there, then replenish them; he added that "maybe" Gary told him this also, but he was not sure. [*Id.* p. 48] Finally, he testified that Mr. Martinez told him he would only be signing as a guarantor, and that SFG would be the borrower, adding, "I think" Mr. Martinez told him the draws on the line of credit would be minimal, but he could not swear to it. [*Id.* pp. 54-56]

As pointed out above, the Court must view this conflicting evidence in the light most favorable to Defendants. Therefore, for purposes of the summary-judgment motion, the Court must accept the following as fact: (1) Mr. Dykes did speak with Mr. Martinez about the line of

---

[5]Neither side presented any evidence from Sharon Dykes, for reasons that have not been disclosed to the Court.

credit before the transaction was consummated; (2) Mr. Martinez told him the line of credit would be used for vendors, and explained how a line of credit would work, including the fact that only small sums would be drawn from the line and then replenished; and (3) Mr. Martinez also told him he would only be a guarantor, not a primary obligor.  The question for the Court, then, is whether these facts, accepted as true, would give rise to a duty to disclose any information to Mr. Dykes.

Although it is a close call, the Court finds the above facts, if proven at trial, would allow a finding that Plaintiff did owe a duty to disclose at least certain facts to Mr. Dykes.  The fiduciary-relationship special circumstance is not present here, and there is no evidence that Mr. Dykes expressly reposed a trust and confidence in Mr. Martinez or any representative of Plaintiff.  Furthermore, there is no evidence the "special knowledge material to the transaction" circumstance exists, because as with the Maldonados there is no evidence that Plaintiff was aware that Mr. Dykes, as a shareholder and investor of SFG, was not privy to the company's financial information.  In addition, there is no evidence that Plaintiff knew what Mr. Day or Ms. Milloy were telling Mr. Dykes or what SFG's plans were with respect to the line of credit, so there is no evidence Plaintiff knew SFG was committing or planning to commit fraud.  The one special circumstance as to which there appears to be a genuine issue of material fact, however, is the one involving some disclosure to a third party, which could become misleading if disclosure of other facts is not made.  As pointed out above, there is evidence that Mr. Martinez told Mr. Dykes that only small draws would be made from the line of credit, to be used to pay SFG's vendors, and that these small draws would be replenished.  Mr. Martinez knew, however, that the first $30,000 of the line of credit was to be applied to the interest SFG owed on its prior loan.  This is a substantial amount to be drawn immediately from the line of credit, and directly contradicts Mr. Martinez' alleged representations that the line would be used only for SFG

vendors, and that only small amounts of money would be drawn from the line at any one time. Furthermore, the fact that Plaintiff obtained a benefit from the line-of-credit transaction, in the form of payment of the $30,000 in interest that may or may not have been forthcoming otherwise, is a factor to be considered. *See, e.g., Macon County Livestock Market, Inc. v. Kentucky State Bank*, *Inc.*, 724 S.W.2d 343, 350 (Tenn. App. 1986) (where bank participates in the transaction at issue, courts have been more willing to attach liability for nondisclosure). Therefore, if Mr. Dykes can prove at trial that he did discuss the line of credit with Mr. Martinez before the transaction, and that Mr. Martinez did make the representations noted above, a determination could be made that Plaintiff violated its duty of disclosure due to its failure to inform Mr. Dykes about the $30,000 interest payment. On this record summary judgment is inappropriate as to Mr. Dykes.[6]

**Conclusion**

As discussed above, whether summary judgment is appropriate in this case depends on whether the line-of-credit transaction was truly an arms-length transaction, or whether there is evidence that Plaintiff made any misleading representations to help induce Defendants to enter into the transaction. As to the Maldonados, the only evidence in the summary-judgment record is that they signed the necessary documents purely on the basis of their trust in Mr. Day, without ever consulting Plaintiff or having any contact at all with Plaintiff. Furthermore, there is no evidence to support their assertion that Plaintiff somehow conspired with Mr. Day or Ms. Milloy in their efforts to induce the Maldonados to participate in the transaction. As to Mr. Dykes, however, there is some evidence that he spoke to Mr. Martinez prior to the line-of-credit transaction and that he was misled by some of Mr. Martinez' statements as well as the

---

[6] The Court is not certain what to do about Mrs. Dykes, but given the complete lack of evidence concerning her knowledge of the transaction and the possible implications of the community-property doctrine, the Court will not grant summary judgment at this time.

suppression of significant information concerning the $30,000 interest payment.  Therefore, summary judgment will be granted as to the Maldonados, but denied as to Mr. Dykes and his wife.  Given the fact that the Maldonados and the Dykes' are co-obligors on the same promissory note, the Court is willing to reconsider the summary judgment decision as to the Maldonados if the evidence at trial establishes that any misrepresentations made to Mr. Dykes should be considered in analyzing the Maldonados' decision to enter into the line-of-credit transaction.

## ORDER

A Memorandum Opinion having been entered this date, it is hereby ORDERED that the motion for summary judgment filed by Plaintiff (Doc. 38) be, and hereby is, GRANTED in part and DENIED in part.

Dated this 16th day of January, 2008.

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE