IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

BANK OF ALBUQUERQUE, N.A.,

        Plaintiff,

v.                                                No. CIV 07-44 BB/WDS

WILLIAM T. DYKES, SHARON T.
DYKES, ANTONIO P. MALDONADO,
and JUANITA H. MALDONADO,

        Defendants.

COURT'S FINDINGS OF FACT
AND CONCLUSIONS OF LAW

THIS MATTER came on for a bench trial on February 11, 2008, and having adduced all the evidence, considered the closing arguments, trial briefs, and proposed findings of fact and conclusions of law submitted by the parties, and being fully advised, the following are the Court's Findings of Fact and Conclusions of Law:

## Findings of Fact

1.    Plaintiff Bank of Albuquerque, N.A. (the "Bank"), is a national banking association organized and existing under the laws of the United States with its main office located in Albuquerque, Bernalillo County, New Mexico.  Mr. Paul Sowards is President of the Bank.

2.    Defendants William T. Dykes and Sharon T. Dykes, and Defendants Antonio P. Maldonado and Juanita H. Maldonado are Texas residents.

3.     Sandia Food Group ("SFG") was a corporation which operated Johnny Carino restaurants on a regional franchise basis.

4.     Mark Day, an Austin, Texas, developer and entrepreneur, was the Chief Executive Officer and a principal of SFG.  Julia Milloy was the Officer of Finance of SFG.

5.     The Maldonado Defendants met Mr. Day through their Amway business and became his friends.

6.     Defendant William T. Dykes was a longtime football coach who invested in SFG at the suggestion of two of his former football players, Mickey Rogers and Daniel Stanton, who were then affiliated with SFG.

7.     At or before the time he began investing in SFG, Defendant William T. Dykes received an Executive Summary from SFG.  Prior to this, the Dykes had owned interests in a car dealership, an office building, and some oil wells.  In April 2002, Mr. Dykes filled out a Purchase Questionnaire and checked the box indicating he "considers himself to have such knowledge and experience in financial and business matters to enable him, without assistance of a financial advisor, to evaluate the merits and risks of an investment in the Partnership, should he be given an opportunity to invest."  He and his wife also reported an annual income of more than $200,000.00 and a net worth in excess of $1,000,000.00.  (Ex. 33).

8.     Through Rogers and Stanton, SFG promised a 15% return to be paid annually on all shares.  In 2001, SFG changed its structure from a corporation to a limited partnership called SFG, LP.  SFG had cash flow problems from its inception and was able to make only one of the 15% payments it had guaranteed its investors, including the Dykes.

9.      SFG periodically sent financial statements, profit and loss statements, and other financial information to Defendants.

10.     The Dykes Defendants originally purchased shares in SFG, but subsequently became equity partners.  The Dykes Defendants lent SFG $45,000.00 which was converted to equity when SFG was unable to repay.  In 2004, the Dykes reported $75,000.00 in losses from their participation in SFG on their K-1.

11.     In 2004, Mr. Day approached the Bank for a working capital loan to SFG.  Mr. Sowards reviewed SFG's financial statements and concluded that SFG was not financially strong enough to meet the Bank's underwriting requirements.  The Bank therefore declined Mr. Day's request.

12.     Mr. Day and Ms. Milloy then suggested to the Bank three alternatives to obtain financing for SFG.  The Bank was willing to consider: (1) a $200,000 loan to SFG, repayment of which would be guaranteed by Defendants; or (2) a $200,000 loan in the form of a line of credit directly to Defendants who would give SFG the authority to draw on the credit line, or (3) SFG, the Maldonados, and the Dykes would be joint obligators.

13.     Mr. Dykes knew SFG had a cash flow problem and could not secure further loans.

14.     Defendants knew that Mr. Day and Ms. Milloy were discussing with the Bank a possible line of credit and Defendants gave Ms. Milloy their 2002 and 2003 income tax returns and supporting documentation to provide to the Bank for that purpose.

15.     The Bank reviewed the Defendants' personal tax returns and financial statements and, based on the Defendants' financial strength, concluded that the Bank could make a line

3

of credit available so long as the Defendants, not SFG, agreed to be solely responsible for repayment. The Dykes' address on the loan application was listed as SFG's offices at 6801 Jefferson NE, Suite 500, Albuquerque, NM 87109.

16.    Defendants had no contact with the Bank prior to applying for the 2005 line of credit, and none of the Defendants had any relationship with the Bank.

17.    Julia Milloy of SFG informed the Bank that she was to be the sole contact person and instructed the Bank not to contact the Defendants with respect to the line of credit.

18.    Neither Mr. Day nor Ms. Milloy has ever been employed by the Bank.

19.    On or about February 22, 2005, the Bank approved the line of credit on the following conditions:

   A.    The borrowers were to be the Defendants, not SFG.

   B.    The loan amount would be $200,000 with a floating interest rate of 2.5 % over Chase Bank prime rate. Monthly interest-only payments were required with the outstanding principal amount due at the end of the term which was one year.

   C.    The line of credit would not be activated until the previous $1.2 million construction loan to SFG, plus accrued interest on that loan in the approximate amount of $30,000 was repaid.

20.    Gary Martinez was assigned as the Bank's loan officer.

21.    Ms. Milloy discussed the terms and conditions of the loan with Mr. Dykes to be sure he understood the Dykes were responsible for the full $200,00.00. Defendants knew the purpose of the proposed loan was to cover SFG's cash flow shortages, and Ms. Milloy

4

explained to them the Bank required the $1,250,000.00 construction loan must be paid before the Bank would loan anyone additional cash for SFG.  Mr. Dykes understood one of the financial hurdles faced by SFG was the requirement of a very aggressive building and expansion schedule.

22.     Ms. Milloy also explained to Mr. Dykes that the authorization (Ex. 9) would give SFG authority to draw on the line of credit and make payments on the credit line.

23.     The Bank understood that SFG had informally agreed to make the monthly interest-only payments.  However, the Bank never entered into any agreement with SFG with regard to the line of credit and the Bank always considered Defendants the only obligors.

24.     Defendants did not ask the Bank for information about the operative facts of the loan or the creditworthiness of SFG or such other information that would allow them to judge the risks and expediency of the proposed loan. At some time after the loan was approved, Mr. Martinez told Mr. Dykes the line of credit was a revolving fund from which SFG could withdraw funds in its discretion.

25.     Information regarding SFG's financial condition was available to Defendants by the exercise of reasonable diligence, and no one at the Bank made any representation as to SFG's financial condition.

26.     Defendants did not expressly repose any sort of trust or confidence in the Bank regarding SFG.

27.     Plaintiff did not know at any time that SFG was committing or planning to commit a fraud.

5

28.   Representatives of the Bank always believed that as investors and shareholders in SFG, Defendants knew about SFG's financial condition and had access to SFG's financial records.

29.   No one at the Bank ever told the Defendants that SFG was financially sound, had the financial ability to make monthly interest payments on the credit line, or anything else about SFG's financial condition.

30.   The Bank prepared the necessary loan documents which were sent to Defendants through Ms. Milloy.

31.   No one at the Bank ever told the Defendants that only small amounts would be withdrawn from the line of credit each month to meet SFG's temporary needs for cash, or that those amounts would be replenished so that the available line of credit would always remain approximately $200,000.00.  At the time of the signing, Defendants were not made aware that the Bank sought payment of SFG's $30,000.00 obligation from the 2005 note proceeds.

32.   No one at the Bank ever told the Defendants that if they gave SFG access to the credit line, the Bank would permit SFG to make only minimal draws on the line, that the Bank would prohibit SFG from making large draws, that the Bank would prohibit SFG from completely drawing down the entire line of credit, or that the Bank would require that SFG periodically pay down the credit line.

33.   No one at the Bank ever told the Defendants that SFG would be obligated to repay the credit line, that Defendants would be obligated to pay only in the event SFG failed to pay, or that Defendants would be merely guarantors.

6

34.     The loan documents signed by Defendants contained all of the material terms of the loan.  Defendants, who were defined in the promissory note as "Borrower," were required to make monthly interest payments.  At the end of the one-year term, which was March 3, 2006, Defendants were to pay all outstanding principal plus all accrued unpaid interest.  The note specifically provided that "[t]he obligations under this Note are joint and several.  Above the signature lines, the note stated:   "PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL OF THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  EACH BORROWER AGREES TO THE TERMS OF THE NOTE."

35.     Failure to make any payment constituted a default under the promissory note.  Upon default, the Bank was entitled to declare the entire unpaid principal balance on the note and all accrued unpaid interest immediately due.

36.     Also in connection with the loan, Defendants signed a Disbursement Request and Authorization (Pl.'s Trial Ex. 7) and a Notice of Final Agreement (Pl.'s Trial Ex. 6). The Notice of Final Agreement stated:

> By signing this document each Party represents and agrees that:  (a) The written Loan Agreement represents the final agreement between the Parties; (b) There are no unwritten oral agreements between the Parties, and (c) The written Loan Agreement may not be contradicted by evidence of any prior, contemporaneous, or subsequent oral agreements or understandings of the Parties.

37.     Defendants signed the Promissory Note, Notice of Final Agreement, and Disbursement Request showing their address on each as 6801 Jefferson Street NE, Suite 500, Albuquerque, New Mexico 87109.

38.     In connection with the loan, Defendants signed a letter dated March 3, 2005, addressed to Gary Martinez stating "We hereby authorize Bryan Templeton with Sandia Food Group to function on our behalf with the day to day draws and repayments on the line of credit." (Pl.'s Trial Ex. 9). After the loan was authorized, none of the Defendants ever requested that the Bank limit SFG's use of the credit line.

39.     Defendants did not tell the Bank they wanted to be notified whenever there was a draw on the line of credit or that they wanted to receive account statements or other documents showing that draws were being made. Defendants never requested that they be notified when draws were made or when the $200,000 balance decreased by any specific amount or was completely depleted.

40.     SFG completely depleted the credit line within days after it was funded.

41.     Defendants did not monitor the balance of the line of credit during the term of the loan. Defendants did not request account statements from the Bank pertaining to the loan.

42.     Defendants did not request financial information from SFG during the term of the loan.

43.     Although it wasn't obligated to, SFG made the monthly interest-only payments, but on March 3, 2006, at the end of the 2005 Note's term, SFG was unable or unwilling to repay the principal amount.

8

44.   Mr. Martinez called the Defendants, requesting that they pay the outstanding balance plus accrued, unpaid interest or provide updated financial information so the Bank could consider renewing the loan or providing Defendants other options.  During these telephone conversations, Mr. Dykes acknowledged to Mr. Martinez that they were responsible for the debt.

45.   Defendants took no action to rescind or set aside the 2005 loan and alleged misrepresentation and deceit for the first time when this lawsuit was filed in 2007 for breach of a subsequent loan agreement.

46.   After the 2005 loan matured and Defendants were called upon to repay it, Defendants did not complain to the Bank that the credit line should not have been depleted. Rather, Defendants requested that the Bank renew the loan and structure in such a way as to force SFG to make payments rapidly so the line of credit would be paid.

47.   Mr. and Mrs. Maldonado signed a letter dated March 1, 2006, requesting renewal of the loan and stating that "[w]e acknowledge that we are responsible for the repayment of the principal amount of $200,000 and all interest."

48.   Defendants did not request any financial information from either the Bank or SFG prior to renewing the loan.

49.   The Bank was willing to renew the loan in the amount of $180,000.  In connection with the renewed loan, the Defendants signed another promissory note dated June 23, 2006. The new note provided:

William T. Dykes, Sharon T. Dykes, Antonio P. Maldonado, and Juanita H. Maldonado ("Borrower") jointly and severally promise to pay to [Plaintiff], or order, in lawful money of the United States of America, the principal amount

of One Hundred Eighty Thousand & 00/100 Dollars ($180,000) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance from June 23, 2006, until paid in full.

50. The loan was restructured from a line of credit to a principal plus interest loan. The new loan required three quarterly principal payments of $45,000 each and one final principal and interest payment of $46,207.50. Failure to make any payment constituted a default under the new promissory note. Upon default, the Bank was entitled to declare the entire unpaid principal balance on the note and all accrued unpaid interest immediately due.

51. The new note specifically provided that "[t]he obligations under this Note are joint and several." Above the signature lines, the new note stated: "PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL OF THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE NOTE."

52. Also in connection with the loan, Defendants signed a Business Loan Agreement dated June 23, 2006, setting forth additional terms for the renewed loan.

53. Defendants also signed a Disbursement Request and Authorization and a Notice of Final Agreement

54. Immediately above the signature lines, the Notice of Final Agreement states in bold: "Each Party who signs below, other than Bank of Albuquerque, N.A., acknowledges, represents, and warrants to Bank of Albuquerque, N.A. that it has received, read and understood this Notice of Final Agreement."

10

55.    Again, each of these documents indicate Defendants' address as 6801 Jefferson Street NE, Suite 500, Albuquerque, New Mexico 87109.

56.    The Bank did not misrepresent anything or deceive Defendants with respect to the 2006 loan.

57.    Mr. Dykes specifically testified he does not believe the Bank did anything wrong with regard to the 2006 loan.

58.    By signing the renewal loan documents, Defendants knew they were obligating themselves to repay the $180,000.00 loan.

59.    Mark Day committed suicide, and SFG failed as a going business concern.

60.    Neither Defendants nor SFG made the first payment that was due on the 2006 note on September 30, 2006.  Pursuant to the terms of the 2006 Note, the Bank declared all outstanding principal and accrued unpaid interest immediately payable. Defendants have failed or refused to pay the amounts due.

61.    At no time did the Bank offer any fiduciary or trust services to Defendants.

62.    The Bank never agreed to be Defendants' financial advisor, nor did the Bank ever provide any financial advice to Defendants.


<u>Conclusions of Law</u>

1.    The Court has jurisdiction over the subject matter of, and the parties to, this action.

2.    The 2005 promissory note was a valid and binding contract.

3.    The 2006 promissory note is a valid and binding contract.

4.    The 2006 promissory note extinguished the 2005 promissory note.

5.   Defendants are jointly and severally liable under the 2006 note and business loan agreement and each Defendant is bound to pay the entire debt. § 38-4-3 NMSA 1978 (1998 Repl. Pamp.).  By failing to pay as promised, Defendants breached the 2006 promissory note.

6.   The 2006 Business Loan Agreement is a binding contract.

7.   By failing to pay as promised, Defendants breached the 2006 Business Loan Agreement.

8.   Defendants are jointly and severally liable under the 2006 promissory note and Business Loan Agreement.

9.   Julia Milloy was not the Bank's agent.

10.  The relationship between the Bank and Defendants did not fall into any of the distinct classes that may give rise to a duty of disclosure. *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank*, 766 P.2d 928 (N.M. App. 1988).

11.  No "special circumstances" were present that justify imposing a duty of the Bank to disclose anything to Defendants.

12.  Plaintiff is not liable for failing to disclose to Defendants any information regarding SFG's finances that Defendants should have been and indeed were aware of.

13.  Defendants have failed to meet their burden of proving the elements necessary to sustain the "doctrine of deceit" by clear and convincing evidence.

14.  Defendants have failed to prove the Bank committed fraud by clear and convincing evidence.

15.  When Defendants entered into the 2006 loan, they ratified the 2005 loan and lost their right to challenge the 2005 loan under the "doctrine of deceit" or misrepresentation.

12

*See Armijo  v. Nuchols*, 253 P.2d 317 (N.M. 1953); *Dunn v. Hite*, 195 P. 1078 (N.M. 1921); *Romero v. Bank of the Southwest*, 83 P.3d 288 (N.M. App. 2003).

16.      When the Maldonados signed the March 1, 2006, letter to Mr. Sowards, acknowledging their responsibility for repayment of the $200,000 credit line, those Defendants ratified the 2005 loan and their defenses thereto were destroyed.


All tendered findings and conclusions not incorporated herein are deemed DENIED.

A Judgment consistent with these findings of fact and conclusions of law should be drawn up by counsel for Plaintiff and presented to the Court within twenty (20) days.

DATED this 4th day of March, 2008.


**BRUCE D. BLACK**
**United States District Judge**

13